UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| UNITED STATES MARINE, INC. | CIVIL ACTION |
|---|---|
| VERSUS | NO. 08-2571 |
| UNITED STATES OF AMERICA | SECTION "J" (3) |

      United States Marine, Inc. (USMI) brought suit against the United States of America under the Federal Tort Claims Act, alleging that the government illegally disclosed to a competitor certain proprietary design drawings and data relating to a special operations Navy vessel known as the Mark V or MK V. The Government filed a third party complaint against VT Halter Marine, Inc. (VTHMI), which in turn counter-claimed against the Government, alleging ownership rights to the proprietary design data.

      This matter was tried to the Court on January 11th and 12th, 2010. Prior to trial, the Court severed the issue of damages. After considering the pleadings, trial testimony and exhibits, as well as arguments of counsel, the Court renders these Findings of Fact and Conclusions of Law in accordance with Rule 52 (a), F.R.Civ.P.

## **FINDINGS OF FACT**

1. The United States Navy, through is Special Operations Command ("SOCOM") issued a Request for Proposals for the development of a special operations test craft. Halter Marine Inc. ("HMI"), with assistance from USMI, responded to the RFP by developing the XFPB (Extra Fast Patrol Boat) design, and built an XFPB parent

craft. At this time, HMI was a subsidiary of Trinity Marine Group (TMG). No government funds were used in the design or development of the XFPB craft. All of the design and development costs were borne by USMI and/or TMG.

2. In order to compete for the SOCOM contract, HMI, together with USMI, ultimately developed two MK V test craft designs from the XFPB, one aluminum and one composite, using the XFPB design as its parent craft.

3. In 1993, HMI was awarded two test craft contracts by SOCOM, one each for an aluminum hull craft and a composite hull craft. In each case, HMI delivered to SOCOM certain technical data for the MK V design that clearly restricted SOCOM's use of the data for evaluation of the proposals. The proposals further stated that if contracts were awarded, the design data would be furnished subject to restrictions on the government's use and disclosure as provided in the contracts. Each of the contracts also incorporated by reference DFARS clause 252.227-7013 "Rights to technical data and computer software." [Trial Exhibit no. 41] Data, as used in this clause, includes "detailed design data".

4. DFARS clause 252.227-7013 is a standard government contract clause which provides that in cases where technical data is developed solely at the private expense, with no part of the cost of development paid for by the Government, and the development was not required for the performance of a Government contract, the Government has only "limited rights" to use, duplicate or disclose such technical

data without the written permission of the party asserting the limited rights. An exception is made in cases where the Government's use or disclosure "is necessary for emergency repair and overhaul". In that circumstance, the use or disclosure must be made subject to a prohibition that the person to whom the data is released or disclosed may not further release, disclose or use such data; and the party asserting the limited or restricted rights is notified.

5. The design drawings and technical data provided by HMI pursuant to the two test craft contracts were clearly marked with a "limited rights legend" as prescribed by DFARS clause 252.227-7013, which allowed the government or SOCOM only limited rights in the drawings and data. Although perhaps not marked on each page of a detailed set of drawings, the legend was imprinted on the cover or face sheet of each set of detailed drawings.

6. Initially, the working relationship between USMI and TMG was informal, based on a handshake and friendship between their principals. Eventually, in 1995, TMG sent a letter to USMI confirming that both companies shared ownership rights to the MK V design.

7. In 1995, SOCOM awarded a production contract to HMI based on the aluminum test craft design for the MK V. Again, HMI submitted design drawings to SOCOM which were imprinted with the restricted rights legend prescribed by DFARS clause 252.227-7013.

8. Subsequently, HMI constructed 24 MK V aluminum hulled vessels which were delivered to SOCOM. The MK V is designed as a high speed, military special operations craft, intended for the purpose of transporting, inserting and extracting special forces personnel (Navy Seals). The design is unique due its special military use, both in hull design, power, outfitting, general interior arrangement, payload, LCG (longitudinal center of gravity), plus a government requirement for the vessel to be transported into a specified envelope aboard a C-5 Galaxy aircraft. It is the entirely of the design and not only the hull which comprises the trade secret claimed by plaintiffs.

9. Through a series of corporate mergers or acquisitions, and a sale out of bankruptcy court, HMI and its proprietary data became VT Halter Marine, Inc. in 2002.

10. Once VTHMI was formed, litigation ensued between USMI and VTHMI over rights to the MK V design. In March, 2004, these parties entered into a written agreement confirming their joint ownership of the proprietary MK V design data.

11. At all material times, USMI and VTHMI (and its predecessors in interest) restricted access to their proprietary designs and data, including the MK V, in various ways. Security within the companies limited access to only those employees who needed to access the designs. Only limited information was disclosed, on an as needed basis, to outside vendors or suppliers. Employees were required to sign non-disclosure agreements. Contracts and design drawings included limited rights

legends or references. In summary, plaintiffs always treated the MK V design data as proprietary trade secrets, using various procedures to protect the critical information from public disclosure.

12. In 2004, the Office of Naval Research (ONR) within the U.S. Navy awarded a research grant to the University of Maine for the purpose of developing a design to improve the ride and handling capabilities of the MK V special purpose craft. This was intended to address complaints that the crew and special forces personnel were suffering higher than normal injuries as a consequence of riding in these vessels. Ultimately, in 2006, Maine Marine Manufacturing LLC (MMM), a joint venture between University of Maine and Hodgdon Yachts, Inc., was awarded a contract by ONR to design and construct a prototype special operations craft known as the MK V.1. The design of the MK V.1 was intended to be nearly identical to the original MK V design, with only a few changes designed to improve the ride and handling. The idea was that the two vessels would be tested and compared side by side after the prototype was built.

13. Between 2004 and late 2006, ONR provided numerous, detailed MK V design drawings to Donald L. Blount & Associates (DLBA) and Hodgdon, who were acting as contractors to MMM. ONR was well aware that the Navy had only limited rights to use this proprietary data and that it was prohibited from disclosing such data except for very limited purposes such as repair work, without the consent and approval of the owner of the MK V design.

14. At no time did ONR or anyone else with the Navy or U.S. Government request or obtain consent from USMI or VTHMI (or any of its predecessors in interest) for release of the MK V design drawings to DLBA or Hodgdon.

15. It is evident that DLBA and Hodgdon used and derived economic benefit from the MK V design drawings received from ONR. This is evidenced by the testimony y of Richard Wilson, who was a project engineer for the Navy on the MK V.1 project. Attached to Mr. Wilson's deposition was a series of emails between DLBA or Hodgdon and the Navy, , during the period of March 2004 through October 2006, in which the contractors continued to request additional design drawings and data for the original MK V vessel, and the Navy responded by supplying additional drawings. In one particular email exchange between Hodgdon's project manager Tom Sawyer and Mr.Wilson, on February 22, 2006, Sawyer specifically asked how the MK V drawings could be used. He noted that the drawings contained a "limited rights legend" block, but said he was unable to read all of the print. Sawyer asked Wilson whether these drawings could be legally used by Hogdgon or its subcontractors to design any portions of the MK V.1 vessel. Sawyer further stated "Needless to say, I hope [Hogdgon] can use these drawings as guidelines in order to keep this design effort to a minimum." Wilson responded that "The Government has very limited rights to these drawings. They can be used for repair, but not for construction. * * * What I would suggest is to use these for guidance and functionality in developing your own drawings for the MK V.1 so as not to infringe on their data rights."

16. Clearly, the Government recognized that it had only "very limited rights" in the proprietary design for the MK V vessel. Although project engineer Wilson advised Hodgdon and DLBA of these limited rights, Wilson nonetheless disclosed, without consent, numerous detailed design drawings without the consent of the rights owners. Further, although Wilson cautioned that the drawings "can be used for repair but not for construction", he well knew that Hodgdon was not engaged in any repair work for the Navy, but rather was contracted to design and construct a new vessel known as the MK V.1.

17. It is also clear that the improperly disclosed design information was used by DLBA and Hogdgon to develop the design for the MK V.1. This became evident during the trial when a number of comparable drawings for the two vessels were laid atop each other, with striking similarity in profile, arrangement, layout and positioning of the designs. There are simply too many similarities between the designs to be purely coincidental. The limited modifications made by MMM (or its contractors) to the original MK V design were those necessitated by use of the composite hull instead of aluminum, and by changes in available equipment. There were also some changes to the deadrise angle[1] of the hull and inclusion of a double chine,[2] which were the primary changes intended to improve the ride and handling of the vessel. In all other respects, the designs are virtually identical.

---

[1] The angle of the V shape hull measured upward from a horizontal plane at keel level.

[2] A chine is where the side of a hull meets the bottom at a well-defined angle, rather than a rounded section.

18. The MK V design is not publicly available and could not be easily reverse engineered from the MK V vessel without access to the detailed design data owned by plaintiffs. Although perhaps not impossible, the testimony showed that any attempt at reverse engineering of this special purpose military vessel would be difficult, costly and time consuming. In fact, neither the Government nor MMM or its subcontractors employed reverse engineering in developing the design for the MK V.1 vessel.

19. USMI and VTHMI did not become aware of the Government's unauthorized disclosure of their proprietary design to MMM or its subcontractors until sometime in May, 2007. USMI filed an administrative claim for misappropriation of its trade secrets in September 2007.

## **CONCLUSIONS OF LAW**

1. The Court has subject matter jurisdiction under 28 U.S.C. §1331 (federal question) and 28 U.S.C. §2671 et seq. (Federal Tort Claims Act). Venue is proper in this district.

2.  A statute of limitations issue in a FTCA case is governed by federal law. United States v. Kubrick, 444 U.S. 111, 123 (1979). A claim under the FTCA is barred unless presented to the appropriate agency within two years after accrual. 28 U.S.C. § 2401(b). The discovery rule applies to actions under the FTCA. Gould v. Department of Health & Human Services, 905 F.2d 738, 742 (4th Cir. 1990). Under the discovery rule, a claim accrues when the claimant knows or, in the exercise of reasonable diligence, should have known of his injury. The Court concludes that this lawsuit is not time barred because the administrative claim was made within two years of the date that plaintiffs discovered that the Government had disclosed their proprietary design data.

3.  The FTCA provides a limited waiver of the federal government's sovereign immunity. Johnston v. United States, 85 F.3d 217, 218-219 (5th Cir. 1996). This Act states that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Under the FTCA, the United States' liability for tort claims is "in the same manner and to the same extent as a private individual under like circumstances" according to the law of the state where the alleged tortious action occurred. 28 U.S.C. § 2674; Owen v. United States, 935 F.2d 734, 737 (5th Cir. 1991). The FTCA covers claims for misappropriation of trade secrets. Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1252 (D.C. Cir. 2005). Since the alleged tortious action in this case occurred in Virginia, that state's substantive tort law applies in this case. Id.

4. Misappropriation of a trade secret is a statutory tort in Virginia under its version of the Uniform Trade Secrets Act, Va. Code Ann. 59.1-336 through 59.1-343. Under this statute, a trade secret is information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to, and not being readily discernible by proper means by, other persons who can obtain economic value from its disclosure or use. Va. Code § 59.1-336

5. A trade secret can relate to technical matters such as the composition or design of a product, which clearly would include the design of a special operations use military craft. The designs for the MK V vessel constitute proprietary information and trade secrets owned by the plaintiffs. The MK V design "had independent economic value from not being generally known and readily ascertainable by proper means by persons who could obtain economic value from their disclosure." MicroStrategy Inc. v. Li, 268 Va. 249, 263 (Va. 2004).

6. Both federal and Virginia law require that the alleged trade secret be actually hidden from public view. The right to exclude others is generally "one of the most essential sticks in the bundle of rights that are commonly characterized as property." Kaiser Aetna v. United States, 444 U.S. 164, 176 (1979). "With respect to a trade secret, the right to exclude others is central to the very definition of the property interest. Once the data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property

interest in the data." <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1012 (U.S. 1984). Virginia law provides that a trade secret must not be "readily ascertainable by proper means by other persons." Va. Code § 59.1-336(1). The Court finds that though reverse engineering would not have been impossible, it was sufficiently difficult, cumbersome and expensive that the design was not "readily ascertainable" through reverse engineering. Moreover, there is no evidence that reverse engineering was used to develop the design for the MK V.1.

7. The Virginia statute requires that the owners of trade secrets make reasonable efforts to maintain secrecy. Va. Code § 59.1-336. Plaintiffs employed reasonable precautions and security measures to protect their trade secrets. USMI and VTHMI (or its predecessors in interest) maintained security measures to restrict access to the detailed designs, required employees and vendors to execute confidentiality or non-disclosure agreements, included restrictions on use of the designs in contract provisions, and placed "limited rights legends" on the face sheet of the drawings. The government failed to present credible evidence to rebut the evidence or suggest that the policies and procedures in place were inadequate or otherwise compromised.

8. The Vessel Hull Design Protection Act, 17 U.S.C. §§ 1301-1332, provides one means of protecting original designs of vessel hulls. However, it is not mandatory and therefore is not dispositive evidence that the plaintiffs failed to adequately protect their trade secret. First, the Act only protects the design of the hull, and not

11

the design of the entire vessel. Second, the Plaintiffs had a reasonable basis for not registering their designs under this statute, which would have required them to disclose such designs to the world.

9. In order to prove the misappropriation of a trade secret, the plaintiff must show that the new product was not substantially different from the alleged trade secret. <u>Young Design, Inc. V. Teletronics Intern, Inc.</u>, 38 Fed. Appx. 994 *3 n. 6. The evidence was compelling that the Mk V and the Mk V.1 are substantially similar. The Court notes that the Mk V.1 was designed to improve upon the MK V design in a few specific ways such as improving the ride quality of the boat. Otherwise, the specific intent was to duplicate the MK V vessel.

10. In order to make a claim that a trade secret has been misappropriated, plaintiff must show that the party who disclosed the trade secret knew or had reason to know that permission from the owner of the secret was required prior to disclosure. Va. Code § 59.1-336(2)(b)(2). Both the contractual provisions and limited rights legends were sufficient notification to the government that disclosure of the Mk V design would violate a duty to its owners. The government knew it had only limited rights that would allow use of the drawings for repairs, but not for new construction. Despite such knowledge, the government provided large numbers of detailed design drawings and data to those involved with the development of the MK V.1 design.

11. Although the government knew that it could not disclose or release this proprietary

data without the consent or permission of its owners, at no time did the government request or obtain such permission.

12. The United States misappropriated the MK V design owned by United States Marine, Inc. and VT Halter Marine, Inc. by disclosing the design to DLBA, Hodgdon Yachts and Maine Marine Manufacturing, without consent or permission.

13. VT Halter Marine, Inc. (or its predecessor in rights, Halter Marine, Inc.) did not utilize the proprietary data of another company in designing and constructing the MK V special operations craft. Accordingly, VT Halter is not liable to the United States on its third-party breach of contract claim for any damages that may be owed to United States Marine, Inc.

New Orleans, Louisiana on this the 1st day of April 2010.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE